IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| AUTOMATED LAYOUT TECHNOLOGIES, LLC, <br><br> Plaintiff, <br><br> vs. <br><br> PRECISION STEEL SYSTEMS, LLC, et al., <br><br> Defendants. | 4:20-CV-3127 <br><br> MEMORANDUM AND ORDER |

The plaintiff, Automated Layout Technologies, LLC ("ALT"), has filed a motion for preliminary injunction (filing 136) that would enjoin the defendants, Precision Steel Systems, LLC ("PSS"), Donner Steel Works, Inc., and Nicholas Donner, "from making, using, offering to sell or selling the PLS-624 machine, including but not limited to exhibiting and marketing" the machine at a trade show occurring this month. *See* filing 139 at 4. According to ALT, this relief is warranted because the defendants' machine infringes on its patents. For the reasons outlined below, the Court will deny the motion.

## I. BACKGROUND

This case involves machinery used to expedite the fabrication of commercial metal handrails, such as railings used in staircases. *See* filing 124 at 4. Traditionally, before fabrication can begin, workers "manually lay out the design for a handrail" using "markers, tape measures, squares and compasses." Filing 124 at 4. However, this process takes several hours and is prone to human error. Filing 124 at 4. To improve these issues, ALT created the Lightning Rail— a "fully-automated [computer numerical control] marking machine" that

"dramatically reduce[s] the amount of time that workers have to spend laying out their designs prior to fabrication." Filing 124 at 1,4. In layman's terms, the Lightning Rail "uses a digital layout created using modern computer assisted drawing technology and then prints the layout onto the work surface with near perfect accuracy," allowing "a greater proportion of a worker's time [to] be devoted to fabrication." *See* filing 124 at 4. According to ALT, this machine is the first of its kind "created specifically for the layout of commercial handrails and similar products." *See* filing 139 at 4.

The Lighting Rail first debuted at industry trade shows in 2018 as a "patent pending" product. Filing 124 at 7; filing 139 at 7. At that time, the machine was covered by pending "U.S. Patent No. 10,576,588 ("the '588 Patent"), which was applied for on September 5, 2017. Filing 124-1 at 2. While attending one of these trade shows, Nicholas Donner—the owner of defendant-entities PSS and Donner Steel Works—allegedly "scanned his convention badge at ALT's booth" and requested information about the Lightning Rail. Filing 124 at 7; filing 139 at 7-8. In the weeks that followed, Mr. Donner and ALT representatives allegedly communicated via phone, mail, and email about Mr. Donner potentially purchasing a machine. Filing 139 at 8.

However, ALT contends that Mr. Donner's interest in the Lighting Rail was, in fact, a ploy to gather information about the machine's function, design, and price. *See* filing 139 at 8. In July 2018, Mr. Donner stopped responding to ALT's communications. Filing 124 at 8. Thereafter, in his capacity as President of Donner Steel Works, Mr. Donner allegedly commissioned third parties to gather additional information about the Lighting Rail and perform reverse engineering. Filing 124 at 9. Ultimately, ALT alleges that Mr. Donner

commissioned the production of his "copy-cat product"—the PLS-624—which was designed with reference to the ALT patents.[1] Filing 124 at 8-9.

On March 2, 2020, Mr. Donner incorporated PSS for the purpose of selling the PLS-624 as "the premier railing and miscellaneous metals layout system on the market." Filing 124 at 8-10. The next day, the '588 patent was officially issued. Filing 124-1 at 2. According to ALT, the PSS website advertising the PLS-624 allegedly incorporated meta tags using its trademarks "with the intention of diverting Internet users . . . to Defendants' website, instead of a website associated with ALT." Filing 124 at 12. In response to this activity, ALT sent PSS a cease and desist letter in August 2020 informing "[PSS] of its allegations of infringement of the '588 Patent, as well as Mr. Donner and [PSS's] unauthorized use of the terms 'lighting rail' 'automated layout technology' and 'ALT' on its website." Filing 1 at 9; filing 124 at 12. But according to ALT, the parties were unable to resolve these disputes. Filing 124 at 12.

Thus, on October 29, 2020, ALT filed a continuation application to the '588 patent—U.S. Patent No. 11,426,826 ("the '826 Patent")—and the next day filed the current action against the defendants, asserting patent and trademark infringement, unfair competition, and deceptive practices. *See* filing 1; filing 124-2. In May 2021, the Court stayed the case while the defendants' *ex parte* request for reexamination of the '588 patent was pending with the U.S. Patent and Trademark Office ("USPTO"). *See* filing 61; filing 66. During the stay, the defendants filed a second and third request for *ex parte* re-examination with the USPTO, challenging the validity of additional claims of the '588 patent. *See* filing 79 at 2. Ultimately, after amendments submitted by ALT, the USPTO

---

[1] As will be outlined below, although ALT alleges that the PLS-624 was designed with reference to its "patents," when the first model of the PLS-624 was allegedly designed and completed, only the '588 patent had been filed by ALT.

determined that all of the claims of the '588 patent were patentable over the prior art. *See* filing 79 at 2; filing 124 at 6.

On May 12, 2022, the Court lifted the stay. *See* filing 79. And the next day, Mr. Donner and PSS allegedly approached ALT to inform them of a "redesigned" PLS-624. Filing 124 at 12-13. Shortly thereafter, in June 2022, ALT filed an amended complaint, again alleging the original PLS-624 infringed the '588 patent (with no mention of the redesign). *See* filing 86. From there, the case progressed, with the parties filing multiple dispositive motions. *See* filing 90; filing 93; filing 129.[2] On August 30, 2022, the USPTO officially issued the '826 patent. Filing 124-2. According to ALT, in September 2022, the PSS website was purportedly advertising the redesigned PLS-624 for sale. *See* filing 108 at 5; filing 124-5. In October 2022, ALT learned that "PSS sold its first redesigned PLS-624" and that the buyer was using the original PLS-624 until the redesign could be delivered. Filing 139 at 5. In response, ALT amended its complaint in December 2022 to allege (1) infringement of the '588 patent by the defendants' original PLS-624, and (2) infringement of the '826 patent by the defendants' redesigned PLS-624.[3] *See* filing 108 at 1; filing 124.

Approximately twenty-three days later—over two years into this litigation, and eight months after being told of the PLS-624 redesign—ALT filed the current motion for preliminary injunction. *See* filing 136. For the first time, ALT asked the Court to preliminarily enjoin the defendants from "making,

---

[2] These dispositive motions are still pending. As they involve the '588 patent and ALT's trademark claims, those motions need not be determined to rule on the current matter.

[3] In moving for leave to amend, ALT asserted its belief that the original PLS-624 would also infringe the '826 patent. *See* filing 108 at 4. But since the defendants asserted that this design no longer existed, ALT chose not to bring a separate claim alleging this infringement. *See* filing 108 at 4.

using, offering to sell or selling the PLS-624 machine," and it specifically requested that the Court prevent them from doing so "at the nation's largest and most significant trade show in the steel fabrication industry on April 12-14, 2023." Filing 136 at 1. According to ALT, since "PSS does not appear to be marketing, showing, or offering for sale the *original* version of the PLS-624, the present Motion is narrowly tailored to address only the *redesigned* version of the PLS-624 infringing the '826 patent." Filing 139 at 26.

## II. STANDARD

In light of the parties' arguments, the Court must address what standard applies when reviewing ALT's motion for preliminary injunction. Specifically, the Court must decide whether the "substantial question test" from the Federal Circuit is applicable in the instant case. *See* filing 146 at 15-17; filing 150 at 4-6. According to ALT, the Court must apply the Eighth Circuit's *Dataphase* factors when deciding whether to issue a preliminary injunction, and the Federal Circuit's substantial question test is inconsistent with that precedent. *See* filing 150 at 5. The Court disagrees with ALT's assertion that these are conflicting standards which the Court must choose between.

Generally, when deciding whether to issue a preliminary injunction, the Court weighs the four *Dataphase* factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Johnson v. Minneapolis Park & Recreation Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013); (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). Since a preliminary injunction is an extraordinary remedy, the movant bears the burden of establishing its propriety under these factors. *Roudachevski*

*v. All-Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir. 2011); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Likelihood of success on the merits is the most significant factor. *Laclede Gas Co. v. St. Charles Cty.*, 713 F.3d 413, 419-20 (8th Cir. 2013). And while a party seeking injunctive relief need not necessarily show a greater than 50 percent likelihood that it will prevail on the merits, the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied. *Barrett v. Claycomb*, 705 F.3d 315, 320 (8th Cir. 2013); *Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724, 731 (8th Cir. 2008). With these parameters in mind, the Federal Circuit—which has appellate jurisdiction over patent cases—has articulated a method for considering a patentee's likelihood of success on the merits when the party opposing the preliminary injunction challenges the validity of the patent. *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372 (Fed. Cir. 2009). This is what the parties refer to as the "substantial question test."

Although ALT argues this test is "inconsistent with the presumption of validity" given to patents under 35 U.S.C. § 282, *see* filing 150 at 5, in crafting this test, the Federal Circuit explicitly recognized that a "patent enjoys the same presumption of validity during preliminary injunction proceedings as at other stages of litigation." *Titan Tire Corp.*, 566 F.3d at 1377. "Thus, if a patentee moves for a preliminary injunction and the alleged infringer does not challenge validity, the very existence of the patent with its concomitant presumption of validity satisfies the patentee's burden of showing a likelihood of success on the validity issue." *Id.* at 1377.

But this Court agrees with the logic of the Federal Circuit that the inquiry cannot always end there: When an alleged infringer, in responding to a preliminary injunction motion, raises a substantial question as to the validity of the patent, this must also be considered when determining the patentee's

likelihood of success on the merits. *Id*. at 1377. And when such evidence is presented at this stage, it must be evaluated with the understanding that "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006).

During a trial on the merits, "an alleged infringer who raises invalidity as an affirmative defense has the ultimate burden of persuasion to prove invalidity by clear and convincing evidence." *Titan Tire Corp*., 566 F.3d at 1376-79; *Low Temp Indus., Inc. v. Duke Mfg. Co.*, No. 4:20-cv-686, 2021 WL 6124455 (Fed. Cir. 2021). Once the challenger presents such evidence, "the burden of going forward shifts to the patentee to present contrary evidence and argument." *Titan Tire Corp*., 566 F.3d at 1377. After assessing this evidence as a whole, the ultimate question is whether the alleged infringer presented clear and convincing evidence the patent is invalid. *Id*.

Although the burdens at the preliminary injunction stage "track" those at trial, they must still be "tailored to fit the preliminary injunction context" where the evidence in front of the Court is limited. *See id*. at 1377. Thus, while the patentee is not required to *prove* validity to be entitled to a preliminary injunction, nor must the alleged infringer *prove* invalidity by clear and convincing evidence at this stage. *See id*. And as with all preliminary injunctions, the ultimate burden rests with the movant.

Accordingly, when an alleged infringer raises a question regarding a patent's validity in response to a preliminary injunction, the Court must consider this evidence, along with any rebuttal evidence presented by the patentee, and decide whether the patentee has shown it will *likely* prove infringement <u>and</u> that it will *likely* withstand challenges, if any, to the validity of the patent. *Id*. If the patentee has not shown that the alleged infringer's

invalidity defense lacks substantial merit, it has failed to demonstrate a likelihood of success on the merits. *Id.*

ALT points to federal district court opinions, as well as dissenting opinions from the Federal Circuit—none of which are binding on this Court—to suggest the substantial question test is "inconsistent" with the traditional preliminary injunction analysis outlined in *Dataphase*. Filing 150 at 5. One such argument lodged against the substantial question test is that it impermissibly requires the patentee to *prove* it can overcome an invalidity defense to be entitled to a preliminary injunction. Filing 150 at 5 (citing *Keystone Retaining Wall Sys., Inc. v. Basalite Concrete Prods., LLC*, No. 10-cv-4085, 2011 WL 6436210, at *2 (D. Minn. Dec. 19, 2011)). And the *Keystone* court argues that requiring such proof is flawed because "obviously a patentee can establish that it is likely to prevail on the merits even if the non-movant raises a substantial question about infringement or validity. A question can be 'substantial' even if it is not likely to result in a ruling in favor of the party raising it." *Id.*

But this characterization of a "substantial question" overlooks the guidance in *Titan Tire*. Surely, even if an alleged infringer raises a question of invalidity, the patentee may still be able to demonstrate a likelihood of success of the merits. But whether or not it can do so inherently requires a "balancing of *all* the evidence before the court," *including evidence presented in support of invalidity. Titan Tire Corp.*, 566 F.3d at 1378 (emphasis added). Therefore, simply asserting an invalidity defense is not enough for an alleged infringer to defeat a patent's presumption of validity at this stage. However, if a patentee cannot present evidence that a "substantial question" of invalidity raised by the alleged infringer "lacks substantial merit," it also follows that the patentee has failed to show it is likely to succeed on the merits. *Id*. at 1379. And such a finding *does* require the conclusion that the invalidity question is likely to result in a ruling for the alleged infringer: "[W]hen analyzing the likelihood of success

factor, the trial court, after considering all the evidence available at this early stage of litigation, must determine *whether it is more likely than not that the challenger will be able to prove at trial, by clear and convincing evidence, that the patent is invalid.*" *Id.*

In other words, this test does not require the patentee to *prove* validity. Instead, it tracks the burdens that will be applicable at trial and asks, in light of all the evidence, if the patentee is likely to succeed on the merits. *See Gonzales*, 546 U.S. at 428. To allow a patent's presumption of validity to justify a preliminary injunction without consideration of substantial questions of invalidity would render the "likelihood of success of on the merits" prong a mere formality. Thus, the Court will apply the Federal Circuit's substantial question test when determining ALT's likelihood of success on the merits under *Dataphase*, as these precedents can (and should) be applied simultaneously and consistently. *See Revision Military, Inc. v. Balboa Mfg. Co.*, 700 F.3d 524, 526 (Fed. Cir. 2012) ("Substantive matters of patent infringement are unique to patent law, and thus the estimated likelihood of success in establishing infringement is governed by Federal Circuit law.").[4]

---

[4] In opposing the substantial question test, ALT also argues there are "conflicting" Federal Circuit panel decisions regarding this test, and questions whether it is viable under the Supreme Court's decision in *eBay, Inc.* v. *MercExchange LLC*, 547 U.S. 388, 391 (2006). *See* Filing 150 at 5 (citing *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 660 F.3d 1293, 1294 (Fed. Cir. 2011) (Newman, J., dissenting)). Though not binding, the Court finds the analysis of the Honorable Kevin McNulty to be extremely thorough and highly persuasive on this point. *See Fresenius Kabi USA, LLC v. Fera Pharms., LLC*, No. 15-cv-3654, 2016 WL 5109142 (D.N.J. Sept. 20, 2016). And the Court agrees with the conclusions that (1) *eBay*—which dealt with the issuance of a permanent injunction—is not so on point as to overturn the substantial question precedent in the Federal Circuit, and (2) *Titan Tire* effectively reconciled purported inconsistencies in Federal Circuit panel decisions,

Still, the movant's likelihood of success on the merits—and thus the consideration of substantial questions of invalidity—is only one *Dataphase* factor the Court must consider in deciding whether to grant ALT's motion for preliminary injunction. Thus, the Court will weigh each *Dataphase* factor, keeping in mind that the primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief. *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789-90 (8th Cir. 1989); *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984).

## III. DISCUSSION

### 1. ALT'S LIKELIHOOD OF SUCCESS ON THE MERITS

Since failure to establish a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied, the Court will begin with this factor. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009). The '826 patent was issued by the USPTO on August 30, 2022, and the Court begins with the presumption that this patent is valid. *See* filing 124-2 at 2. However, since the defendants have raised an invalidity defense, the inquiry cannot end here.

Specifically, the defendants argue that the '826 patent is an invalid continuation patent under 35 U.S.C. § 120—and therefore not entitled to the '588 patent's priority date—because it adds new matter that is not actually or inherently disclosed in the written description of the '588 patent. *See* filing 146 at 23-25. And since the '826 patent was filed on October 29, 2020, the defendants

---

demonstrating how the substantial question test operates in harmony with the traditional preliminary injunction factors. *Id.* at *7-17. Therefore, this Court will likewise apply the Federal Circuit's substantial question test over these objections.

argue it is invalid, as the PLS-624 is anticipated prior art. *See* filing 146 at 25-28.

Ultimately, the Court must decide whether the defendants have raised a "substantial question" of invalidity under this theory. To do so, it cannot view either party's evidence and arguments in a vacuum. Instead, it must consider, *based on the net of evidence in front of it*, "whether it is *more likely than not* that [the defendants] will be able to prove at trial, by clear and convincing evidence, that the patent is invalid." *Titan Springs*, 566 F.3d at 1379-80. The Court answers this question in the affirmative—meaning ALT has failed to demonstrate a likelihood of success on the merits.

"To obtain the benefit of the filing date of a parent application, the claims of the later-filed application must be supported by the written description in the parent 'in sufficient detail that one skilled in the art can clearly conclude that the inventor invented the claimed invention as of the filing date sought.'" *Anascape, Ltd. v. Nintendo of Am. Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010) (quoting *Lockwood v. American Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)). In other words, the written description of the earlier '588 patent must provide support for the claims of the later '826 application, as required by 35 U.S.C. § 112, in order for the '826 application to claim priority to the earlier filing date. *PowerOasis, Inc., v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008). Under this standard, "[w]hile a prior application need not contain precisely the same words as are found in the asserted claims" of the subsequent application, "the prior application must indicate to a person skilled in the art that the inventor was 'in possession' of the invention as later claimed." *Id*.

This standard is used "to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the [original] patent specification." *Anascape, Ltd.*, 601 F.3d at 1335. It necessarily follows that entitlement to a

filing date does not extend to "new matter" which is not disclosed. *See id.* at 1338. When a description is broadened by removing limitations, that is considered "classical new matter." *Id.* (citing *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1344 (Fed. Cir. 2008)).

Nor does entitlement to a filing date "extend to subject matter which is not disclosed, but would be obvious over what is expressly disclosed." *PowerOasis, Inc.*, 522 F.3d at 1306. Likewise, a patent is not presumed to support "variants" of a claim that are not described in the written description. *See Anascape, Ltd.*, 601 F.3d at 1339. Thus, it is "not a question of whether one skilled in the art *might* be able to construct the patentee's [later] device from the teachings of the [prior] disclosure," but instead, a question whether the missing descriptive matter is necessarily present in "the original application's specification such that one skilled in the art would recognize such a disclosure." *PowerOasis, Inc.*, 522 F.3d at 1306 (cleaned up).

ALT focuses its arguments in support of this motion on its claim that the redesigned PLS-624 infringes on Claim 1 of the '826 patent. *See* filing 139 at 27-30.[5] In response, the defendants argue that this claim, and claims dependent thereon, are not entitled to the September 2017 priority date of the '588 application because this claim "introduces new matter and broadens the scope of the disclosed subject matter of the '588 patent." Filing 146 at 25. Specifically, the defendants argue that the "marking device" language in Claim 1 of the '826 patent is new matter not supported by the '588 patent's written description. Filing 146 at 23-24. The defendants also argue the "controller" limitation in

---

[5] "Infringement requires that every limitation *of a claim* be met, either literally or equivalently, by the accused devise." *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004) (emphasis added).

Claim 1 similarly adds new matter not supported by the written description of the '588 patent. Filing 146 at 23-24.

In considering this argument, it helps to compare these claim limitations side by side. As for how the pattern is placed onto the workstation, the patents contain the following claim limitations:

- "*[A]n ink dispenser* attached to the beam and configured to move along the beam in a second direction different from the first direction, *the ink dispenser* further configured to *dispense ink directly onto the work surface of the table*." Filing 124-1 at 20 (the '588 patent) (emphasis added).

- "*A marking device* attached to the beam and movable along the beam, *the marking device* configured *to move into contact with the metal work surface and mark the metal work surface* with an assembly pattern that outlines one of more components of the railing assembly." Filing 124-2 (the '826 patent) (emphasis added). Claim 3 of the '826 patent also describes a fabrication workstation "*wherein the marking device is a marker*."

The language in these claims "must be interpreted, in light of the [original patent's] written description, but not beyond it, because otherwise they would be interpreted to cover inventions or aspects of an invention that have not been disclosed. *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 433 F.3d 1373, 1375 (8th Cir. 2006) (Lourie, J., concurring). And while "[c]laims are not necessarily limited to preferred embodiments . . . if there are no other embodiments . . . then they may be so limited," as "[o]ne does not receive

entitlement to a period of exclusivity for what one has not disclosed to the public." *Id.*

The written description of the '588 patent describes the "ink dispenser" accordingly:

> The ink dispenser system is configured to deposit ink onto the work surface of the table in the form of a pattern of the railing assembly. In one example, the ink dispenser system includes *a movable nozzle* that is configured to move linearly in a vertical direction relative to the work surface (e.g., a z-direction). *The moveable nozzle can be actuated, for example by air or hydraulic pressure*, so *that the nozzle is positioned at a distance from the work surface so that ink can be deposited on the surface* in a clear and define manner [sic] (i.e., not blurry or appearing diffuse). *The ink dispenser system also includes an ink reservoir configured to hold a supply of ink that can be transferred to the nozzle, for example using a fluid pump.*

Filing 124-1 at 15 (emphasis added). That *could* be construed as a preferred embodiment of the ink dispenser system—but it's the *only* embodiment described in the written description, and notably, ALT doesn't argue for a preferred embodiment here. Later, the ink dispensing system is similarly described:

> The ink dispensing system includes a nozzle and an ink reservoir. The nozzle is configured to deposit ink onto the work surface of the table. *In one embodiment, the nozzle is pneumatically operated. In particular, the nozzle is moved in contact with or otherwise adjacent to the work surface in response to an air input.* The nozzle, in some

- 14 -

examples, can remain at a constant distance above the work surface while ink is deposited onto the surface. When the air input is removed, a spring attached the nozzle causes it to move away from the work surface to its initial position above the surface. The ink dispenser system also includes an ink reservoir to hold a supply of ink. *In one example, the reservoir is a plastic container capable of holding a one or two gallons of ink [sic]. The reservoir can be located adjacent to the nozzle on the beam or at one of the beam [sic]. No matter its location, the reservoir may include a pump to move the ink to the nozzle.*"

Filing 124-1 at 17.

In alignment with this written description, Claim 1 of the '588 patent describes "a controller" that is configured to move the beam and ink dispenser. The claim limitation states:

> [A] controller configured to operate *the first and second motors to move the beam and ink dispenser relative to the work surface*, the controller further configured *to operate the ink dispenser to dispense ink onto the work surface of the table in a pattern of the railing assembly.*

Filing 124-1 at 20. Claim 22 explains the function similarly:

> The device of claim 1, wherein the ink dispenser includes a nozzle, the nozzle having a resting position above the work surface, the nozzle *configured to move vertically down the work surface in*

- 15 -

*response to an air input*, wherein upon ceasing the air input, the nozzle returns to the resting position.

Filing 124-1 at 20. However, Claim 1 of the '826 patent asserts different claim limitations as to the controller system:

> [A] controller including computer executable code that, when executed by the controller, *causes the* **one or more motors** *to move the marking device* into contact with the metal work surface and mark the metal work surface with the assembly pattern.

Filing 124-2.

When assessing the defendants' invalidity claim at trial, the ultimate question will be whether—considering the written description of the '588 patent—one skilled in the art of metal fabrication would recognize that, at the time of this filing, ALT was in possession of an automated layout invention that executed pattens on a workstation using a *marker*[6] that was moved into contact with the workstation *by motors*. *See Anascape, Ltd*, 601 F.3d at 1338-39. The

---

[6] The Court agrees that "marking device" is likely a means-plus-function term—when given their plain meaning, there is no evidence that these words have sufficiently definite meaning as the name for a structure in the field. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). And while the defendant proffered expert testimony supporting this conclusion, *see* filing 146 at 19-22, ALT offered no rebuttal argument or evidence as to this issue. This conclusion would limit the scope of Claim 1 of the '826 patent to identified structures that perform the function of that claim limitation. Thus, relevant to this claim is whether it is more likely than not that the defendants can produce clear and convincing evidence that the "marker" structure disclosed in the '826 patent is not adequately disclosed by the '588 patent's written description.

Court finds that, at this stage, the defendants' argument and evidence raises a substantial question as to whether the written description of the '588 patent sufficiently describes this later-claimed subject matter.

The plain meaning of the word "marker" generally encompasses "something used for marking: such as a type of felt tip pen that makes wide lines"—think Crayola. *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/marker (last visited April 10, 2023). And the Court cannot find a single reference in the '588 patent's written description which suggests that ALT—or a person of ordinary skill in the field—would understand the ink dispenser system in its invention to encompass such a marker. *PowerOasis, Inc.*, 522 F.3d at 1308.

Instead, the "ink dispenser system" in the '588 patent's written description involves a "nozzle"[7] that "deposits"[8] ink onto the work surface using ink that is transferred from an ink reservoir to the nozzle using a "pump."[9] *See* filing 124-1. Such a mechanism, where ink is seemingly transferred through machinery to a nozzle that then projects or deposits ink onto the workstation is clearly different than a felt tip marker that simply draws the pattern onto the work station. And while a "marker" may seem like an rather obvious variant, or alternative, to ALT's described ink dispenser system for purposes of transferring

---

[7] Defined as "a projecting vent of something" or "a short tube with a taper or constriction used (as on a hose) to speed up or direct a flow of fluid." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/nozzle (last visited April 10, 2023).

[8] Defined as "to let fall." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/deposit (last visited April 10, 2023).

[9] Defined as "a device that raises, transfers, delivers, or compresses fluid . . . especially by suction or pressure or both." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/pump (last visited April 10, 2023).

a layout, a patent is not presumed to support variants it did not describe and it is not sufficient that a written description, when combined with knowledge in the art, would lead one to *speculate* as to modifications the inventor *might* have envisioned, but failed to disclose." *See Anascape, Ltd*, 601 F.3d at 1340.

Similarly, the defendants' provided unrebutted evidence that would support the conclusion that the written description of the '588 patent does not sufficiently disclose a marking device that is configured to move vertically into contact with the workstation *using motors*. In describing how the ink dispenser is moved vertically in relation to the workstation, the written description of the '588 patent indicates that the nozzle is "pneumatically operated," *see* filing 124-1 at 17, or that it is movable by "air or hydraulic pressure," *see* filing 124-1 at 15. And this mirrors the language in Claim 1 of the '588 patent, where motors are specifically mentioned in describing what propels movement of the "beam" along the workstation, and the "ink dispenser" along the beam. *See* filing 124-1 at 20.

The word "motor," however, is noticeably missing when Claim 1 of the '588 patent describes the ink dispenser's vertical movement toward the workstation before it deposits the ink. *See* filing 124-1 at 20. Thus, the evidence and argument proffered by the defendants at least raise a question as to whether Claim 1 of the '826 patent introduces new matter—why would one of ordinary skill in the art, upon being informed that the nozzle of the ink dispenser is moved by air or hydraulic pressure, infer what was really intended was a nozzle that was moved by a third (unmentioned) motor? *See Anascape, Ltd*, 601 F.3d at 1338 (citing *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1341 (Fed. Cir. 2008)).

But raising a question of invalidity is not enough. The Court must view the net of the evidence to determine whether there is a *substantial* question of invalidity. The Court finds that there is, as ALT failed to present any evidence

or argument at this stage establishing that the defendants' invalidity defense lacks substantial merit. *Id.* at 1379. ALT's downfall was its decision to hang its hat on its position that the substantial question test is inconsistent with *Dataphase*, and therefore, the presumption of validity extended to the '826 patent is sufficient, on its own, to warrant a preliminary injunction. *See* filing 150 at 4-8.

Likely relying on this position, ALT outlined how the redesigned PLS-624 *infringes the '826 patent*, but failed to provide any evidence or argument—apart from conclusory statements—demonstrating *why the claims of the '826 patent do not introduce new matter and are supported by the written description of the '588 patent*. *See* filing 139 at 29-30. As preliminary injunctions are an extraordinary measure, the ultimate burden to prove the appropriateness of the remedy always lies with the movant. And the Court cannot find that ALT met this burden under the substantial question test where it proffered no evidence directly in rebuttal to the defendants' invalidity defense.

Specifically, when arguing the '826 patent is a valid continuation patent, ALT makes the following conclusory statements: (1) "A continuation application is entitled to the benefit of its parent patent's priority date"; (2) "The '826 Patent is a continuation of the '588 patent. The '826 Patent names the same inventors as the '588 Patent, claims priority to the '588 Patent, and has the same specification"; (3) The face of the '826 patent states . . . that it is a "Continuation of application No. 16/775,848 . . . which is a continuation of application No. 15/695,294, filed on Sep. 5, 2017, now Pat. No. 10,576,588"; and (4) "The claims of the '826 Patent are supported by the specification." Filing 150 at 7-8.

When the evidence and arguments of the parties are viewed collectively, such conclusory statements would only help demonstrate that the defendants' invalidity argument lacked substantial merit *if* claims in a continuation application were *presumably* entitled to the effective filing date of an earlier

filed application. But that is not always the case. "In the absence of an interference or rejection which would require the [USPTO] to make a determination of priority, the [USPTO] does not make such findings as a matter of course." *See PowersOasis, Inc.*, 522 F.3d at 1305. Thus, in cases where there has not been an interference or rejection lodged in relation to a continuation patent, "there is simply no reason to presume that claims in a [continuation] application are entitled to the effective filing date of an earlier filed application." *See id.*

Here, the USPTO has not made a priority determination regarding the '826 patent, as it has yet to rule on the defendants' *ex parte* reexamination raising this question. *See* filing 146 at 9; filing 150 at 7. Therefore, since the '826 patent is not presumed to be a valid continuation patent, ALT's conclusory statements that it is do little to demonstrate it is likely to withstand the defendants' priority argument at trial. Additionally, ALT's claim that this *ex parte* reexamination of the '826 patent will likely fail, because the defendants' previous *ex parte* reexaminations involving the '588 patent were unsuccessful, misses the mark. *See* filing 150 at 7. ALT has conceded that the defendants' prior reexamination requests involved the *patentability of the '588 patent*. *See* filing 74-1 at 1-2. It then goes on to claim that, based on this prosecution history, "[t]here is no reason to believe the PSS's fourth reexamination request will fare any better." Filing 150 at 7.

However, ALT's only support for this assertion is that the defendants' reexamination request "incorrectly assumes that the patent is not entitled to its proper priority date." Filing 150 at 7. But again, where there is no basis for the Court to presume the claims in the '826 continuation patent are entitled to the '588 patent's priority date, ALT's conclusory statement that the defendants are wrong is of no evidentiary value. And since this *ex parte* reexamination does not involve the patentability of the '588 patent's claims, the Court does not see how

the outcome of those matters is indicative of the USPTO's conclusion on priority. Considering the net of the evidence *in front of the Court*, it is more likely than not that the defendants will be able to show, by clear and convincing evidence, that the '826 patent is not entitled to the priority date of the '588 patent. Thus, the '826 patent would be given an October 29, 2020, priority date. *See* filing 124-2 at 2.

And by arguing that the original and redesigned PLS-624s infringe the '826 patent, *see* filing 139 at 9, it necessarily follows that, if the defendants' priority argument prevails, the defendant has raised a substantial question as to whether the original PLS-624 (which also used industrial-strength markers) anticipated the '826 patent as prior art. *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004); filing 1-3 at 4.

Under 35 U.S.C. § 102(a)(1), "[a] person shall be entitled to a patent unless . . . the claimed invention was patented, described in a printed publication, or in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention." And "[w]hether a prior art reference anticipates a patent claim is a question of fact." *TriMed, Inc. v. Stryker Corp.*, 608 F.3d 1333, 1343 (Fed. Cir. 2010). Overall, "invalidity by anticipation requires that the four corners of a single prior art document describe every element of the claimed invention, either expressly or inherently." *Id.* (cleaned up). Given this standard, it is widely accepted that "a product which would literally infringe if later in time anticipates if earlier." *Upsher-Smith Lab'ys, Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).

Thus, since ALT argues that both the original and redesigned PLS-624 infringe the '826 patent, if the defendants' priority argument succeeds, there is evidence that the '826 patent was anticipated by the original PLS-624 as prior art. Especially because neither party disputes that the PLS-624 was being advertised to the public for sale before the '826 patent was filed. *See generally*

filing 1. And again, ALT only addresses this anticipation argument with its conclusory claim that "[t]his argument incorrectly assumes that the patent is not entitled to its proper priority date." Filing 150 at 7.

At this stage, the Court cannot find that such "evidence" is sufficient to conclude the defendants' invalidity defense lacks substantial merit. In reality, that may be the case. But ALT simply did not provide rebuttal evidence addressing the defendants' invalidity arguments. And the Court can only balance the net of the evidence that was actually provided. Thus, given that preliminary injunctions are an extraordinary measure and the burden remains with ALT to demonstrate such relief is appropriate, the defendants' substantial question as to invalidity prevents ALT from establishing, at this stage, that it has a likelihood of success on the merits.

## 2. Threat of Irreparable Harm to ALT

ALT also argues it "will suffer irreparable harm in the form of (1) lost market share; (2) lost sales; (3) permanently lost customers; (4) lost service opportunities; (5) price erosion; and (6) reputational harm" if it is forced to "compete against a deeply discounted knockoff of its own patented technology." Filing 139 at 5, 19-23. In addition to contesting whether such losses have been demonstrated, the defendants argue that ALT's delay in seeking preliminary injunctive relief "renders any claim of irreparable harm not credible." Filing 146 at 34-39.

To show a threat of irreparable harm, the movant must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief. *Roudachevski*, 648 F.3d at 706. Stated differently, the harm "must be actual and not theoretical." *Brady v. Nat'l Football League*, 640 F.3d 785, 794 (8th Cir. 2011). And harm is not irreparable when a party can be fully compensated for its injuries through an award of

damages. *Gen. Motors Corp. v. Harry Brown's, LLC,* 563 F.3d 312, 319 (8th Cir. 2009).

It has been held that such factors as price erosion, loss of goodwill, damage to reputation, and loss of business opportunities may all be valid grounds for finding irreparable harm. *See Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1304 (Fed. Cir. 2013). But it has also been held, on the other hand, that a loss of customers or customer goodwill is not truly "irreparable," in the sense that they can be addressed through money damages after a trial on the merits. *Novus Franchising*, 725 F.3d at 895; *see World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 161 (2d Cir. 2012).

Overall, it is the movant's burden to "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original); *see Minn. Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973). And "an unreasonable delay in moving for the injunction can undermine a showing of irreparable harm and 'is a sufficient ground to deny a preliminary injunction,'" especially when the delay is inexplicable in light of the plaintiff's knowledge of the conduct of the defendant. *Evan NG v. Bd. of Regents of the Univ. of Minn.*, No. 22-1505, 2023 WL 2779339, at *4 (8th Cir. April 5, 2023) at *4 (quoting *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019)); *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013).

Here, the Court finds that, in light of all the evidence, ALT has failed to show a likely threat of irreparable harm that is certain and great. The Court agrees with ALT that *Trebro Mfg., Inc. v. Firefly Equip., LLC*, 748 F.3d 1159, 1170 (Fed. Cir. 2014), is instructive when determining whether a patentee has shown a likelihood of irreparable harm in a small, niche market. For example, the Court agrees that "opportunities to attract customers and make sales are . . . scarce in [a] tight market." *Id*. Thus, infringing products in such markets

can lead to a loss of market share and access to customers that may not be fully reparable by money damages, especially if the patentee only makes a small number of sales each year and buyers are not likely to replace the product for many years in the future." *Id.* Accordingly, in *Trebro*, where there was uncontroverted testimony showing that the patentee and alleged infringer (a new market entrant) were the only competitors in a market where the patentee made approximately eight sales a year, every sale to the alleged infringer was a loss to the patentee that resulted in "a sizeable percentage of the yearly market." *Id.*

Despite the similarities between the markets at issue here and in *Trebro*, key differences exist—mainly that Trebro Manufacturing *did* demonstrate a likelihood of success on the merits and provided *uncontroverted* evidence demonstrating a real, nonspeculative probability of losing customers and market share. *Id.* In the instant case, as outlined above, ALT did *not* demonstrate it is likely to succeed on the merits. Considering the substantial questions raised as to the validity of the '826 patent, it necessarily follows that any harm caused to ALT by the PLS-624's infringement of that patent is uncertain at best.

Additionally, although ALT claims the PLS-624 is its sole competitor, the only evidence supporting this claim is conclusory testimony from the Lightning Rail's co-inventor, Stephen Chasse. *See* filing 139 at 16-17. And unlike in *Trebro*, this assertion is controverted by the defendants, who list fifteen machines that "could be fitted to perform layouts for miscellaneous metal fabrication." *See* filing 146 at 12, 38. In response, ALT argues that whether these machines are actually alternatives to the Lightning Rail is "speculative" because there is no evidence these machines have been purchased "for the purposes of manufacturing commercial handrails." Filing 150 at 13-14.

However, ALT's conclusory statement that "none" of these machines are competitors in this market is equally unsupported and speculative. *See* filing 138-1 at 11. And where it is ALT's burden to demonstrate irreparable harm, a conclusory statement that this is a small, niche market with no other competitors is not sufficient to make a showing that the defendants' entry in this market demonstrates a clear and great threat to its market share.

Additionally, while the defendants have sold one PLS-624, *see* filing 139 at 11, unlike in *Trebro*, ALT has not demonstrated that this sale was made to a customer that previously purchased its Lightning Rail. *See Trebro*, 748 F.3d at 1170. Accordingly, ALT's evidence showing loss of market share, customer loss, and price erosion—damages which *may* not always be reparable with money damages—is much more speculative than that in *Trebro*. And other damages, asserted by ALT, including lost sales and service opportunities, if they do exist, can be adequately addressed through the remedial powers of the Court after trial. *See id.*

Finally, it is worth noting that any claim of irreparable harm presented by ALT is weakened by its delay in seeking injunctive relief. While the Court understands that ALT did not seek injunctive relief at the outset of this litigation based on assurances from the defendants that it was not selling the *original* PLS-624, *see* filing 139 at 10, the preliminary injunctive relief requested concerns the *redesigned* PLS-624. *See* filing 139 at 26. Thus, it is important to consider ALT's diligence in seeking relief regarding this machine in the context of its knowledge regarding that machine.

In May 2021, the Magistrate Judge, in his order granting the defendants' request to stay the litigation, cautioned ALT that its alleged concerns about "ongoing infringement by PSS" with the *original* PLS-624 were questionable given its failure to seek a preliminary injunction at any time in the litigation. *See* filing 61 at 10. The Magistrate Judge emphasized that, without a

preliminary injunction, "PSS [could] continue selling its alleged infringing product." Filing 61 at 10. Over a year later, on May 13, 2022, and after the stay was lifted, the defendants approached ALT about its redesigned PLS-624. Filing 124 at 13. And in September 2022—after the '826 patent had been issued—ALT learned that the PSS website was listing the redesign for sale. *See* filing 108 at 5; filing 124-5.

Still, ALT did not move for preliminary injunctive relief until four months later, and, in fact, omitted such a request in its amended complaint filed in December 2022, despite its knowledge at that time that the defendants had completed a sale of the redesigned PLS-624. *See generally* filing 124. Thus, where the alleged harm has already occurred—the defendants have begun marketing and have already sold the allegedly infringing product—ALT's delay in seeking injunctive relief is relevant in determining the credibility of its claims of irreparable harm.[10] And when this delay is considered in conjunction with the shortcomings discussed above, ALT has not met its burden of demonstrating a likelihood of irreparable harm.[11] Accordingly,

---

[10] Additionally, since ALT never sought preliminary injunctive relief throughout the progression of this trial, nothing was stopping the defendants from marketing and selling the original PLS-624 (even if ALT believed they were not doing so). And nothing was necessarily deterring or stopping the defendants from designing, creating, and selling similar products, which they did. Thus, in actuality, denying the preliminary injunction in this case does not change the status quo as ALT contends.

[11] Given the outcome of these first two factors, a preliminary injunction cannot issue, and the Court need not discuss the other *Dataphase* factors in detail. See *CDI Energy Servs*, 567 F.3d at 402. Even so, where ALT has failed to demonstrate it is likely to succeed on the merits or suffer clear irreparable harm, it necessarily follows that the balance of possible harms does not weigh in its favor, nor is there a public concern if no valid patent is at issue.

IT IS ORDERED that the plaintiff's motion for preliminary injunction (filing 136) is denied.

Dated this 11th day of April, 2023.

BY THE COURT:

John M. Gerrard
Senior United States District Judge